UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Granite Re, Inc., <br> an Oklahoma corporation, | Court File No.: 08-CV-441 (RHK/RLE) |

Plaintiff,

vs.

City of La Crescent, a Minnesota municipal corporation; MinnComm Utility Construction Co., a Minnesota corporation; Daniel J. Weidner; and Mary D. Weidner,

Defendants.

## DEFENDANT CITY OF LA CRESCENT'S
## REPLY POST TRIAL MEMORANDUM OF LAW

Defendant City of La Crescent replies to the Post Trial Memoranda of both Plaintiff Granite Re, Inc. and Defendants MinnComm and Daniel and Mary Weidner.

### ARGUMENT

**I.  GRANITE RE, INC. MISSTATES THE BURDEN OF PROOF IN A DECLARATORY JUDGMENT ACTION**

Plaintiff, Granite Re, Inc., incorrectly argues that "The burden of proof is upon the City to prove it is entitled to relief under Granite's Bond", *see* Doc. 138, p. 7. In support of its argument, Granite Re cites to a Sixth Circuit case and further maintains that Granite Re "did not ask for a declaration of its lack of liability – rather, it asked for a determination of its liability under the Performance Bond." Doc. 183, pp. 7-8.

Granite Re's Complaint for Declaratory Relief alleges, in part, that:

> A. "A justiciable controversy exists under Title 28 U.S.C. § 2201, § 2202 regarding what obligations, if any, Granite owes to La Crescent and what obligations, if any, are owed to Granite by MinnComm, Daniel J. Weidner and Mary D. Weidner." Doc. 1, ¶ 16.
>
> B. "Granite is entitled to declaratory judgment associated with the claims of La Crescent pursuant to Title 28 U.S.C. § 2201 and § 2202, and to such other supplemental relief as the Court may Order." Doc. 1, ¶ 17.

The claims of the City of La Crescent include that Granite Re, Inc. is liable to the City under the terms of the Performance Bond due to MinnComm's breach of contract. By seeking a judicial declaration associated with the City's claim of liability Granite Re, necessarily, takes the position that it is not liable to the City under the terms of the Performance Bond and seeks a declaration to that effect. Otherwise, if Granite Re had determined that it was liable to the City and yet failed to make payment on the City's bond claim, Granite Re would be in breach of the contract language contained in the Bond.

Therefore, by seeking a Declaratory Judgment, no matter how so phrased, Granite Re <u>is</u> seeking a declaration of its lack of liability to the City. That conclusion is inevitable. Granite Re isn't arguing that it forced the parties into this lawsuit seeking a declaration that it <u>was</u> liable to the City – is it?

Magistrate Judge Erickson, in his February 5, 2009 Order, specifically found that " . . . Granite seeks a declaration that it is not liable to La Crescent on a Performance Bond that Granite issued for the benefit of MinnComm." Doc. 65, p. 2. It is disingenuous for Granite Re to now claim, on the basis that Granite Re sought only "a determination of what obligations it has, if any, to the City under the Bond", that the City bears the burden of proof when it has <u>already been found</u> that Granite Re seeks a declaration of its non-liability to the City under the Bond.

2

The question of burden of proof arises when parties are reversed in a Declaratory Judgment action (as when an insurance company seeks a declaration that an injury is not covered by a policy). If there were no Declaratory Judgment actions, the issue would come up when the insured or injured person sued on the policy. In that suit, the person seeking to recover on the policy would have the burden of proving compliance with the policy conditions. Thus, several courts have held that the burden of proof should not be shifted merely because the insurer institutes the action as one for Declaratory Judgment. *American Eagle Ins. Co. v. Thompson*, 85 F.3d 327 (C.A. 8th 1996).

However, many cases have not accepted that view. There seems a good deal to be said for the contrary view that the party who institutes the Declaratory Judgment action should carry the burden.

Even if Granite Re's view prevails, it is substantially qualified in practice by the well-developed line of authority which holds that a plaintiff in a Declaratory Judgment action who voluntarily goes forward and attempts to prove his case will be held to have assumed the risk of non-persuasion. *Liberty Mutual Ins. Co. v. Sweeney*, 216 F.2d 209 (C.A. 3rd 1954); *Pacific Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541 (C.A. 9th 1950); *Bauer v. Clark*, 161 F.2d 397 (C.A. 7th 1947), cert. denied 68 S.Ct. 210.

It is generally reasonable and fair that one who brings another into court should have the burden of proving the prima facie elements of its claim. "Where an insurer seeks a declaration of non-coverage as to a particular accident, the insurance company should likewise experience no technical difficulty in producing proof of the facts it asserts." *Liberty Mutual*, supra quoting Moore's Federal Practice.

Granite Re voluntarily assumed the position of a plaintiff in opening this case and accepted the order for its closing. It assumed the burden of proving that it had no obligation under the Performance Bond, instead of requiring that action be taken in assertion of the City's claim that it had a bond obligation. *Liberty Mutual*, supra, citing *Hartford v. Lougee*, 196 A 267 (N.H. 1938).

Granite Re has failed to meet its burden of proving that it has no liability to the City under the Performance Bond.

## II. MINNCOMM'S BREACH OF CONTRACT HAS BEEN ESTABLISHED.

The City has alleged three counts of Breach of Contract by MinnComm.

- A. MinnComm's failure to complete the project work in accordance with the contract plans and specifications on or before November 30, 2007;

- B. MinnComm's failure to complete the project work of installing the pipes in a location in accordance with the contract plans and specifications; and

- C. MinnComm failed to comply with the contract guarantee provision which provides that the equipment, material and workmanship shall be free of defects and strictly in accordance with the plans/specs at the time of complete and acceptance for a period of one year.

*See* Doc. 11, pp. 8-9.

It is undisputed that MinnComm did not timely complete the Main Channel pipe installations. Doc. 134, pp. 14, 15, 28. Likewise, MinnComm admits that the West Channel and Lagoon pipes were not in a location in compliance with the plans/specs within the contract guarantee period. Doc. 134, p. 17; T. 485-87, 513. Therefore, by these MinnComm admissions alone, it is established that MinnComm breached the contract in, at least, these two manners. MinnComm, however, seeks to be relieved of any consequences of its

4

breaches on the basis of its numerous Crossclaims made against the City. As argued below, MinnComm's Crossclaims fail.

In addition, though MinnComm disputes that it failed to install the West Channel and Lagoon pipes at a proper depth, it has offered no contemporaneously recorded evidence or any other credible evidence of the depth at which it allegedly installed those pipes. MinnComm's lack of such documentation and lack of evidence is insufficient to refute the City's evidence of breach in light of the undisputed Wellbore survey evidence. Likewise, MinnComm's lack of such documentation defeats any expert opinion that these pipes "floated up" when the location of their installation is unknown and undocumented.

Even MinnComm's own expert finally admitted that because MinnComm failed to meet good drilling practices by not maintaining contemporaneous records, no data was available upon which he could base an opinion that the pipes installed in any of the river crossings were accomplished at required depths. T. 556-57. This explains why MinnComm's Post Trial Memorandum of Law contains no discussion of what data MinnComm has to prove that they installed the pipes per plans/specs. None exists.

Accordingly, MinnComm's breaches of the contract have been established.

## III. MINNCOMM FAILED TO PROVE ITS CROSSCLAIMS AGAINST THE CITY.

MinnComm seeks to avoid any consequences for its admitted failure to timely install the Main Channel pipes and failure to comply with the contract guarantee clause by alleging breach of contract claims against the City. However the record and MinnComm's Memorandum of Law are equally void of evidence to support any of its Crossclaims against the City.

### A. DEFAMATION

It is important to first note what has not been disputed by MinnComm regarding its defamation claim.

1. MinnComm does not dispute that it failed to adequately plead a defamation claim.

2. MinnComm does not dispute that even if it had sufficiently pled a defamation claim that the City is entitled to Qualified and/or Absolute immunity.

3. MinnComm does not dispute that it failed to prove that the City used false words in its termination resolution even though it admits that they are required to prove that the alleged defamatory statement is false. *See* Doc. 134, p. 26, § III.

Though MinnComm has finally identified the basis of its defamation claim to be the City "publicizing its termination of MinnComm's contract through a public resolution adopted by the City Council.", Doc. 134, p. 21, this Court should, nonetheless, exercise discretion in not permitting the Crossclaim, as pled, to be conformed to any trial evidence because 1) there is no evidence of untrue statements, and 2) La Crescent would be prejudiced by not having had the opportunity to conduct discovery and present trial argument knowing what statement it was defending.

MinnComm's "defamation per se" argument is premature. Doc. 134, p. 26. To be found to be a defamatory per se statement, the statement must first be found to be defamatory. That still requires the alleged defamatory statements to be false. MinnComm has failed to identify any allegedly false statements contained in the Termination Resolution.

Accordingly, MinnComm has failed to prove its Defamation Crossclaim.

### B. PROMPT PAYMENT STATUTE

MinnComm's Post Trial submission merely recites selected provisions of the Prompt Payment Statute, Minn. Stat. § 471.425, subds. 2 and 4. Doc. 134, p. 27. MinnComm has failed to offer either analysis or even mere conclusions in an attempt to establish that it has proven its violation of Prompt Payment Statute.

That can be explained because the clear statutory language leads to the conclusion that the statute applies <u>unless</u> the City, in good faith, disputes the obligation. The City, in good faith, does dispute the obligation. MinnComm has offered neither evidence nor argument that the City did not, in good faith, dispute the obligation. Accordingly, the statute does not apply.

### C. BREACH OF CONTRACT

MinnComm alleges that the City breached the contract by:

A.) not compensating MinnComm for materials/labor furnished which were approved by the City Engineer;

B.) failing to grant extensions;

C.) failing to provide written instructions regarding the problems encountered by MinnComm; and

7

D.) failing to compensate MinnComm for additional costs incurred on the project. *See* Doc. 7, Count One, pp. 6-7.

However, MinnComm's Post Trial Memorandum of Law contains no argument or even a reference to its Breach of Contract claims as contained in Count I.[1] Aside from claiming damages due to its Count I Breach of Contract claims, MinnComm fails to argue the substance of its breach of contract claims.[2] Instead, MinnComm now argues that its Breach of Contract claim is based soley on a Breach of Implied Warranty of plans/specs theory that the City knew of obstructions, yet did not so inform MinnComm. Doc. 134, p. 24. Apparently, MinnComm's Breach of Contract claim has now collapsed into its Breach of Implied Warranty claim.

## D. BREACH OF IMPLIED WARRANTY

MinnComm, citing *McCree & Co. v. State*, 91 N.W.2d 713 (1958), argues that the City, through the <u>mere</u> fact of furnishing contract plans and specifications warranted the sufficiency of the plans for the intended purpose. Doc. 134, pp. 24-26. While it is generally true that the act of an owner in furnishing plans/specs amounts to a warranty of their fitness, that is only the law where the owner furnishes the plans/specs which control not only the particular result to be accomplished, but also the particular construction methods to be used and exercises control throughout the details of the work. *Id.* MinnComm admits that "one of the main reasons assigned for supporting an implied warranty based upon the plan is the control exercised by the owner in furnishing the plan and directing details of the work."

---

[1] Likewise, MinnComm's Post Trial Submission fails to argue or even make reference to its claim of Quantum Meruit, Count II of its Crossclaims.

[2] The same holds true for MinnComm's Count II claim of Quantum Meruit.

8

Doc. 134, p. 25. That main reason for supporting the finding of an implied warranty is absent in this case because the plans/specs, aside from requiring that the pipes be installed by HDD, did not otherwise prescribe or direct MinnComm's construction means and methods. Therefore, this Court must find that no implied warranty exists.

MinnComm's ENTIRE Post Trial argument in support of its claim of Breach of Implied Warranty is that the evidence is "uncontroverted" that Yaggy Colby Associates plans were deficient for failing to identify obstructions and failure to follow HDD industry guidelines. Doc. 134, p. 26. However, even a brief review of the trial transcript and evidence clearly demonstrates that the evidence is most certainly not uncontroverted in this regard.

Mr. Dorwort, MinnComm's expert, opined that Yaggy Colby Associates' design was inadequate because 1) critical data relating to revetments, wing walls and potential obstructions in Riverside Park was withheld and 2) there was a design deficiency in that the 15 foot minimum depth was not sufficient. T. 496, 497, as cited by both Plaintiff and MinnComm at Doc. 134, p. 11 and Doc. 138, p. 9, respectively.

There has been no evidence produced that lack of a geotechnical report, soil analysis or scour analysis[3] was the cause of MinnComm's failure to install the pipes.

---

[3] The issue of scour is irrelevant and a red herring. MinnComm agrees with Mr. Hair and notes that scour is a phenomena that naturally occurs over time which might cause a river bottom to change. Doc. 134, p. 6, ¶ f; T. 770-71. No evidence exists that scour played any part in the Main Channel watermain pipe floating up the very day after installation. The "life" of MinnComm's Main Channel water main pipe was less than one day. *See* Doc. 134, p. 6, ¶ g.

9

Both MinnComm and Granite Re argue that the walk-over locator equipment was suitable and operated competently by MinnComm. Doc. 134, p. 2; Doc. 138, p. 5. However, the evidence produced by both City experts, Mr. Hair and Mr. Adams, indicates that a walk-over system locator, like the one used by MinnComm, is NOT the suitable tool for this project and that a wireline system is the proper locating tool. T. 575, 760, 819. What we do know is that MinnComm twice failed to install the Main Channel crossings using a walk-over locating system. No one else so failed. Out of the contractors mentioned by MinnComm regarding Main Channel installations, the two contractors who used wireline locator systems (Gabes and Intercon) were 4 for 5 attempts, while the two contractors who used walk-over locator systems (Michels and MinnComm) were 1 for 5 attempts.

The other thing we do know is that during the guarantee period the West Channel and Lagoon pipes installed by MinnComm using a walk-over locator system are admittedly located at depth which is not in compliance with the plans/specs. T 485-87.

MinnComm argues that it constructed the project "in accordance with industry standards and practices and drilled the pipeline pilot holes at or below the design path established by Yaggy Colby" in spite of the fact that MinnComm admits that it did not contemporaneously record any drilling data during any of the river crossings, which is contrary to what has been described by BOTH experts Dorwort and Hair as good drilling practice. Doc. 134, p. 2; T. 771-72; 502-03.

Conspicuously absent in MinnComm's Post Trial Brief and trial evidence is any credible evidence indicating what profile it actually drilled any of the water crossing pipes. Though MinnComm concedes that no documentation exists, Troy Weidner maintains that the

10

actual profile drilled was in excess of 15 feet and, at times, 43 feet deep according to MinnComm's own records. T. 255, 279, 282, 339, 325-26. Troy Weidner also testified that MinnComm went deeper on its second attempt. In spite of maintaining that "the driller needs to follow the path as shown on the drawings because if they go deeper and hit an obstruction, it is industry practice that the driller assumes the risk", no evidence exists that MinnComm actually followed the drill path as shown on the plans because no contemporaneous water crossing drilling record was kept by MinnComm. T. 339. To the contrary, the only recorded evidence MinnComm could produce were long after-the-fact records which indicate that the water crossings did <u>not</u> follow the drill path as shown on the plans.

The fact of the matter is that MinnComm drilled its own pipe profile. T. 254, 322-23, 332-34. Dan Weidner concedes that Troy Weidner set the profile. T. 426. That is consistent with John D. Hair's testimony that in practice, all HDD drilling contractors set their own drill profile. T. 762-64.

As excuse for MinnComm's failure to install the pipes both MinnComm and Granite Re argue one discrepancy between the elevation of the Main Channel river bottom according to Yaggy Colby Associates' hydrographic survey data and the river bottom elevation as shown by the Corps of Engineer survey conducted years earlier and as shown by the B-20 soil boring Yaggy Colby Associates had taken.[4] Doc. 134, p. 5; Doc. 138, p, 9. However, MinnComm admits that it checked the bottom of the river while drilling conformed the river bottom location and found no condition that deviated from what was depicted on the plans.

---

[4] It s important to remember that this issue deals <u>ONLY</u> with the Main Channel and <u>NOT</u> the West Channel or Lagoon locations.

11

T. 327. Of course, if MinnComm had discovered such a change in the river bottom condition, it had a contractual duty to report the same to the City and it did not do so.

No evidence exists that MinnComm actually drilled and installed the Main Channel forcemain pipe in accordance with the drill path depicted by the plans/specs at the location of boring B-20. Therefore, Mr. Dorwort's opinion that, because of the discrepancy, "the pipe would float" in that location is not only qualified it is rendered meaningless since the location of actual installation is unknown.[5]

Even if MinnComm had installed the force main Main Channel pipe in accordance with the plan at the location of the B-20 boring, that is just one data point and no evidence exists that that would cause the entire pipe to float. To the contrary, the evidence is clear that if the remainder of the pipe had adequate cover, it would not have floated up. T. 770-72.

Both Granite Re and MinnComm argue that Yaggy Colby Associates had knowledge of "possible drilling obstructions" which were not included in the plans/specs. Doc. 134, p. 6; Doc. 138, p 4. In addition, both parties argue that Yaggy Colby Associates "made no attempt to determine" the exact location(s) of the alleged obstructions. Doc. 134, p. 6; Doc. 138, p. 5.[6] Such arguments are simply not supported by the record which indicates that the pre-design investigation of Yaggy Colby Associates was complete and adequate regarding the known locations of wing dams and shipwreck areas. As a matter of fact, MinnComm's expert investigation revealed the same information that Yaggy Colby Associates' pre-design

---

[5] The same holds true for Mr. Dorwort's opinion that the pipes in the West Channel and Lagoon floated up. Without evidence of where those pipes were installed, Mr. Dorwort has no basis for his opinion that they "floated up."
[6] This issue is limited to MinnComm's Main Channel watermain installation attempt because MinnComm makes no obstruction claim regarding the Main Channel force main installation. T. 208.

12

investigation uncovered. No known wing dam or shipwreck obstructions were located within the final design path area. T. 660, 661, 680-82. In fact, known locations of any alleged shipwrecks in the shipwreck area were not known to anyone. T. 648, 680-82, 107-08. MinnComm admits that "good engineering practice requires full disclosure of all <u>known facts</u> which could have a material impact" on the bid or construction. Doc. 134, p. 12 (emphasis added). Likewise, Mr. Hair testified that valid reasons exist to <u>NOT</u> disclose information to contractors which is neither known nor certain. T. 766. In addition, no evidence exists that MinnComm encountered either a wing dam or shipwreck obstruction. T. 466-69, 537.

MinnComm completed the piolot hole bore and reaming of the Main Channel watermain without event. T. 286-88. Likewise, MinnComm completed the pilot hole bore, reaming and product pipe pull for the Main Channel force main. T. 336-37. No evidence exists that MinnComm encountered a shipwreck obstruction which was the cause of its inability to install the Main Channel crossings. To the contrary, if MinnComm had encountered a shipwreck obstruction in the shipwreck area of Riverside Part in La Crosse, Mr. Dorwort testified that MinnComm's pre-bore and reamer could not have drilled through it. T. 539.

Regarding the claim that MinnComm's Main Channel watermain crossing was thwarted because of Yaggy Colby Associates' failure to disclose information regarding the revetment wall, MinnComm, apparently, wants this Court to rule that it had no obligation to either investigate, inquire or report an open and obvious condition, which was in conflict with the plans, and visible to the naked eye, but, instead, it could blindly rely on the Yaggy

13

Colby Associates' plans, proceed with the project and then claim that the open and obvious condition is to blame for its failed installation attempt.

The uncontroverted evidence is that MinnComm's pilot hole and reaming of the Main Channel watermain were uneventfully completed. T. 286, 288, 524-26. That means that a revetment wall did not prevent MinnComm from performing the water main pilot hole bore and reaming bore. In fact, MinnComm's expert, Mr. Dorwort, testified that MinnComm's equipment <u>could not</u> drill through a rock revetment. T. 539. It only logically follows that if MinnComm's product pipe pull on the Main Channel watermain was in the pilot hole and reamed hole it, too, would have been uneventfully completed. It stands to reason that if MinnComm hit some revetment obstruction while pulling the product pipe, it was not in the pilot bore and reaming hole which had not (and could not have) drilled through a rock revetment.

In further support of the fact that no evidence exists that MinnComm encountered a revetment, Mr. Dorwort testified that when the product was pulled from the ground, no damage to the pipe was observed. T. 470, 526.

## IV. MINNCOMM IS NOT ENTITLED TO ITS CLAIMED DAMAGES

MinnComm seeks an award of damages for costs incurred in its failed attempts to install a water main and force main across the Main Channel. In addition, MinnComm seeks an award of damages for alleged lost revenue for 2008/2009. Because MinnComm breached the contract, it is not entitled to any claimed damages. In addition, because there has been no violation of the Prompt Payment Statute, MinnComm is not entitled to any statutory award for interest and attorney's fees.

14

## A. NO WRONGFUL TERMINATION

MinnComm concedes that approximately half of its claimed damages are due to the City's alleged wrongful contract termination. Doc. 134, p. 27. Yet, the contract termination was not wrongful. MinnComm admits that it missed the November 30, 2007 contract deadline and that the City faced the possibility of severe MPCA sanctions, yet – in the same sentence – MinnComm incredulously claims that there was no basis to terminate the contract. Doc. 134, p. 28. Under the circumstances, MinnComm's failure to timely complete the installation was, in and of itself, a sufficient basis upon which the City could rightfully terminate the contract.

MinnComm goes even further and argues that the City's termination of the contract was not only wrongful but it was "exercised in bad faith" and "vindictive". Doc. 134, p. 28-29. MinnComm is unable to cite to any evidence in the record (because there is none) in support of that argument. In a feeble attempt to argue bad faith (and argue even "beyond bad faith") MinnComm argues that the City had "other options" short of contract termination. Even though there is no evidence in the record about what "other options" the City may or may not have had, the facts establish that the City was not required by either the contract or Bond to proceed with such "other option" and further establish that the City proceeded pursuant to and in compliance with the terms of the project contract and the Performance Bond in terminating MinnComm.

MinnComm's attempts to argue that the City terminated the contract in bad faith go so far as to attempt to establish its claim by alleging a "cover-up" occurred regarding Gabes hitting and replacing the InterCon installed force main. Doc. 134, p. 29. Not only did that

15

event occur long after the contract termination, no evidence exists in the record to support MinnComm's argument. To the contrary, during discovery, including depositions, MinnComm failed to seek information as to that event. T. 161-63.

Accordingly, because no wrongful contract termination occurred, MinnComm is not entitled to recover the half of its claimed damages due to its wrongful termination claim.

### B.   MINNCOMM IS NOT ENTITLED TO RECOVER CLAIMED LOST PROFITS

The other half of MinnComm's claimed damages are for "lost profits". MinnComm next argues that it is entitled to recover its claimed lost revenues due to loss of bonding capacity under the damage theory of "total cost method of damages", even though MinnComm concedes that this method is not the preferred measure of damages by Federal Courts. Doc. 134, p. 30-31.

In Federal Courts, the "total cost" theory of damages is a theory of recovery that can be used when no other method is feasible. *Moorehead Constr. Co., Inc. v. City of Grand Forks*, 508 F.2d 1008, 1016 (8th Cir. 1975). No evidence has been presented that the nature of MinnComm's claimed losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy. Indeed, MinnComm has argued exactly the opposite – that it claimed lost revenues are not speculative because they were based upon a "detailed review of time sheets, certified payroll records and equipment rates." Doc. 134, p. 31. MinnComm can't have it both ways. The nature of the claimed lost revenue profits can't be both highly impracticable to determine with a reasonable degree of accuracy and certain based upon a detailed review of records.

The Federal Courts' disapproval of the total cost method is well founded on the rationale that bidding inaccuracies can reduce a contractor's estimated costs and performance inefficiencies can increase actual expenditures while failing to distinguish between costs for which the owner is responsible and those that the contractor should bear. *Raytheon Co. v. White*, 305 F.3d 1354, 1356 (Fed. Cir. 2002). MinnComm is not entitled to recover claimed lost profits under the "total cost" theory of damages.

Even if MinnComm could rightfully rely on the "total cost" theory, it is nonetheless, not entitled to recover its claimed lost profits because, by its own admission, they are speculative. T. 429. MinnComm did not establish its lost profits claim "by a company officer familiar with the company's accounting practices." *Layne-Minnesota P. R., Inc. v. Singer Co.*, 574 F.2d 429 (8th Cir. 1978). Dan Weidner testified that MinnComm's accountant did not assist in the preparation of MinnComm's lost profit damage claim. T. 428. In addition, the lost profits claim is based upon a flawed business model of indefinite future growth with no increase in employees and does not even take into account the raw data of how many jobs were even available for bidding during 2008 and 2009. T. 428-31. MinnComm's lost profits claim is seriously compromised by its admission that it did not check and, therefore, did not know if there were even enough potential jobs available to sustain its growth projection predictions.

MinnComm does not dispute that lost profits are only recoverable if they are foreseeable. In addition, MinnComm is unable to dispute that the City had no knowledge what effect, if any, contract termination would have on MinnComm's bonding capacity. T. 425, 602, 737, 740-42. Therefore, because the City could not and did not reasonably foresee

the effect of contract termination of MinnComm's bonding capacity, MinnComm's claim of lost profits must be denied.

## CONCLUSION

MinnComm has failed to establish that the City breached the contract and has failed to prove all of its other Crossclaims.

MinnComm breached the contract with the City. Accordingly, Granite Re is obligated to the City for the full amount of the Performance Bond.

Dated: 8/4/09

JARDINE, LOGAN & O'BRIEN, P.L.L.P.

By: /s/ Susan Steffen Tice

JAMES G. GOLEMBECK (A.R.# 179620)
SUSAN STEFFEN TICE (A.R.#131131)
Attorney for Defendant City of La Crescent
8519 Eagle Point Boulevard, Suite 100
Lake Elmo, MN 55042-8624
(651) 290-6500