# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Granite Re, Inc.,
an Oklahoma corporation,

      Plaintiff,

                                   Civ. No. 08-441 (RHK/RLE)
                                   **FINDINGS OF FACT AND**
                                   **CONCLUSIONS OF LAW**

v.

City of La Crescent, a Minnesota
municipal corporation; MinnComm
Utility Construction Co., a Minnesota
corporation; Daniel J. Weidner; and
Mary D. Weidner,

      Defendants.

---

Daniel R. Gregerson, David H. Gregerson, Gregerson Rosow Johnson & Nilan, Ltd., Minneapolis, Minnesota, for Plaintiff Granite Re, Incorporated.

James G. Golembeck, Susan Steffen Tice, Jardine Logan & O'Brien PLLP, Lake Elmo, Minnesota, for Defendant City of La Crescent.

Marvin T. Fabyanske, Thomas A. Forker, Fabyanske Westra Hart & Thomson, PA, Minneapolis, Minnesota, for Defendants MinnComm Utility Construction Co., Daniel J. Weidner, and Mary D. Weidner.

---

## INTRODUCTION

      This matter came on for trial before the undersigned without a jury. Based upon all the files, records, and proceedings herein, including the presentations of counsel, all pre-trial and post-trial submissions, and all relevant and admissible evidence submitted

by the parties and received by the Court, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### THE PARTIES

1.  Plaintiff Granite Re, Inc. ("Granite Re") is an Oklahoma surety authorized to do business in the State of Minnesota and is in the business of issuing performance and payment bonds on behalf of construction contractors.

2.  Defendant City of La Crescent (the "City") is a Minnesota municipality.

3.  Defendant MinnComm Utility Construction Co. ("MinnComm") is a Minnesota corporation specializing in a form of underground construction called horizontal directional drilling ("HDD"). (Trial transcript ("T.") 66-67.)

4.  Defendants Daniel J. Weidner and Mary D. Weidner are individual residents of the State of Minnesota, owners of all outstanding shares of MinnComm, and individual indemnitors of Granite Re under a general agreement of indemnity. (T. 66, Ex. 1000.)

### THE CONTRACT

5.  The City entered into a construction contract with MinnComm on June 27, 2007 for $1,219,276.65 (the "Contract"). (Ex. 1002.) The Contract called for the installation of a water main and sewer force main under the Mississippi River between La Crescent, Minnesota and La Crosse, Wisconsin. All of the installation work was to be performed using HDD. The work included the installation of five segments of pipe under waterways. One segment was under

the west channel of the Mississippi River near La Crescent, two segments were under a lagoon in Pettibone Park, and two segments were underneath the main channel of the Mississippi River between La Crescent and La Crosse (the "Project").  (Exs. 1002, 1020, 1023.)

6.    The Project was required to be completed by November 30, 2007.  (Ex. 1020.)

7.    MinnComm furnished to the City performance and payment bonds issued by Granite Re.  (Exs. 1001, 1026.)

8.    Yaggy Colby Associates ("Yaggy Colby"), an architectural firm, was retained by the City to design the Project and prepare the Project's plans and specifications.  The plans and specifications were incorporated into the Contract.  (Exs. 1002, 1020, 1023.)  According to the Contract, "[a]ll [Project] work shall be done in accordance with the plans and specifications."  (Ex. 1020.)

9.    The Project was not a "design-build" project; MinnComm was not required to design the pipe profile.  (T. 108.)  Yaggy Colby designed the pipe profile and expected MinnComm to install the pipe at the depth of the profile or deeper.  (T. 108.)  MinnComm's civil engineering expert, Brian Dorwart, testified that the contractor will typically need to follow the pipe profile as designed.  (T. 498-99.)

**PROJECT DESIGN**

10. Yaggy Colby assigned three engineers to work on the Project:  Don Borcherding, Dillon Dombrovski, and Christina Peterson.  (T. 74, 633.)  These engineers had limited experience with HDD projects.

11. Dombrovski was involved in one previous HDD project, which did not require a water crossing.  (T. 75.)  He was not familiar with ASTM F 1962.[1] (T. 76-77; Ex. 1125.)  Dombrovski did not consult any engineering firms with HDD expertise when creating the Project plans and specifications.  (T. 85.)

12. Peterson had no HDD experience prior to working on the Project and had no familiarity with ASTM F 1962.  (T. 634, 663.)

13. Borcherding was involved in one previous HDD project, which did not require a water crossing.  (Borcherding Dep. Tr. at 18.)  He did not review any HDD industry guidelines or standards for the Project.  (Id. at 19.)

14. Steve Vrieze served as the Project representative for Yaggy Colby.  (T. 690.)  Vrieze worked on the Project site nearly every day to monitor MinnComm's work.  (T. 690.)  His previous HDD experience consisted of two projects, neither of which involved a water crossing.  (T. 691.)

15. The preliminary design services provided by Yaggy Colby, largely through Peterson, consisted of information gathering.  (T. 633, 636.)  Yaggy Colby conducted a site survey, soil borings, an investigation of potential drilling

---

[1] This ASTM (the American Society for Testing and Materials) provides standard methodology for the design and construction of directional drills.  (T. 444; Ex. 1125.)

obstructions, and an investigation regarding the proper depth at which the pipes should be installed.  (T. 637-60.)

16.   No geotechnical report was prepared and included in the plans and specifications.  (T. 80.)  The City's civil engineering expert, J. D. Hair, has stated that "[a] site specific geotechnical survey should be conducted."  (Ex. 1109.)

17.   The two soil borings taken by Yaggy Colby in the main channel of the Mississippi River were not performed in accordance with recommended industry practice.  (See Ex. 1109.)  The borings were not offset from the alignment of the pipe profile by 50 feet and were not 30 feet deeper than the proposed pipe profile.  (T. 100-01; Ex. 1109.)

18.   Yaggy Colby set a 15-foot minimum cover between the bottom of the river and the installed pipelines for all water crossings.  (Ex. 1023.)  Hair testified that a 15-foot minimum means that the contractor is not required to install the pipe any deeper than 15 feet.  (T. 804-05.)

19.   Yaggy Colby did not follow the recommendations of Michels Pipe Services ("Michels"), a respected contractor with HDD experience in the Project area, in determining the minimum cover.  (T. 636-39; Ex. 1074.)  Michels recommended that the minimum cover be 20 to 25 feet.  (Ex. 1074.) Dombrovski acknowledged that three other contractors with HDD experience would have installed the pipeline deeper than 15 feet below the river bottom. (T. 114-15.)  Intercon Construction, Inc., a contractor that would eventually

replace MinnComm on the Project, installed the force main under the main channel of the Mississippi River with 30 to 35 feet of cover.  (T. 114.)

20.     Hair testified that a minimum cover less than 15 feet violates industry practice. While he testified that he had no basis to state that the 15 foot minimum cover was unacceptable in this case, Hair acknowledged that he would have designed the Project with a deeper minimum cover.  (T. 804.)  For water crossings, Hair's engineering firm generally designs HDD projects with 25-30 feet of cover.  (T. 804.)

21.     Dombrovski did not consult a soils expert when he established the 15-foot minimum cover.  (T. 154.)  No formal soils analysis was conducted or included in the plans and specification.  (T. 101.)

22.     The river bottom contours were determined by Yaggy Colby based upon a survey it performed.  (T. 78.)  However, there was a discrepancy between the elevation of the river bottom according to Yaggy Colby's survey, which was depicted on the plans and specifications, and the elevation of the river bottom as shown in an Army Corps of Engineer hydrographic survey and a soil boring. (Exs. 1188, 1020, 1023.)  Dombrovski acknowledged that he may only have had nine feet of cover over his pipe profile based upon information contained in soil boring B-20.  (T. 155-56.)

23.     Troy Weidner, a MinnComm employee who worked on the Project, verified the river bottom contours in some locations on the Project site.  The depths

matched the plans and specifications depths "as far as [he] could tell."  (T. 326.)

24.    Given the discrepancy between the river bottom as depicted in the Project plans and specifications and the river bottom as depicted in the Army Corps of Engineers' hydrographic survey, Hair testified that the river bottom may be changing over time, i.e., scouring.  (T. 796.)  Given a 15-foot minimum cover and the evidence of scour, Hair testified that the need for a scour assessment became more important.  (T. 796-98.)  Paragraph 7.4.4 of ASTM F 1962 provides:  "Typically, the path should ensure a minimum depth of cover of 15 ft. (5 m) beneath the river bottom as projected over the design life of the pipe line, <u>including allowance for scouring</u>."  (Ex. 1125 (emphasis added).)  No scour analysis was done by Yaggy Colby.  (T. 78.)

25.    A number of possible drilling obstructions were discovered by Yaggy Colby when preparing the Project plans and specifications.  These obstructions included wing dams, bridge abutments and footings, and shipwrecks.  (Exs. 1006, 1009, 1011-13, 1017, 1130-1131.)

26.    Dombrovski knew that his pipe profile went through a shipwreck area.  (T. 79.) He did not know how deep the shipwrecks were nor did he know exactly where they were located.  No steps were taken to discover this information.  (T. 79-80.)  Dombrovski employed no special methods to locate the presence of obstructions.  (T. 79-80.)

27. The plans and specifications did not disclose the possibility of obstructions. (Exs. 1020, 1023.) Dombrovski testified that omitting the information regarding the shipwrecks was an oversight. (T. 107.) Dorwart testified that the "critical data" regarding obstructions should not have been withheld. (T. 497.) Although Hair testified that "anecdotal information" should not be passed to a contractor, he also testified that it is reasonable to assume, if no obstructions are disclosed, that there are no obstructions in or near the pipe profile that might interfere with a successful HDD installation. (T. 765, 810.)

28. While designing the Project, Yaggy Colby learned of an HDD pipe installation under the Mississippi River that had been performed in 2005 by Michels. Michels' encountered significant difficulties on this project, as it took several failed attempts before Michels finally succeeded in installing the pipeline. (Ex. 1006.) No information regarding this HDD project was included in the Project plans and specifications, nor was this information communicated to prospective bidders.

29. Yaggy Colby's final plans and specifications were furnished to MinnComm when bidding the Project. (Ex. 1020, 1023.) These documents were the only materials furnished to prospective bidders, and they were relied upon by MinnComm in bidding and constructing the Project. (T. 255, 366.) According to Dorwart, contractors rely on plans and specifications to provide a constructible pipe profile. (T. 445.)

## MINNCOMM'S WORK ON THE PROJECT

30.     MinnComm's work on the Project began in July 2007. (Ex. 1027.)

31.     MinnComm used a "walk-over" system (an "Eclipse") to track the location of its drill head under ground. (T. 246, 759.) MinnComm's drill head locator, Troy Weidner, had over one thousand hours of experience with the Eclipse at the time the Project was commenced. (T. 246.) The Eclipse provides the depth of the drill head, its pitch, and its temperature while drilling. (T. 251.) The Eclipse can also provide a "forward projection." The forward projection allows the operator to make anticipatory adjustments to the pitch of the drill head to ensure that the designated minimum cover is maintained. (T. 254.)

32.     In order to locate its drill head while crossing the water bodies, MinnComm utilized a non-metal barge. (T. 274.)

33.     Based on the evidence admitted at trial, including the testimony of Dorwart, the Court finds that MinnComm employed accepted industry tools and techniques for the Project. (Ex. 1190; T. 458.)

34.     MinnComm began its work by installing the pipeline on the land portions of the Project leading up to the first water crossing. MinnComm's installation of the pipeline on land was successful. (T. 271.)

35.     MinnComm then began installing the pipelines under the water bodies. MinnComm had previous experience with HDD installations under rivers including the Mississippi River. (T. 352.)

36.     MinnComm installed the pipelines under the west channel and the lagoon with no apparent difficulty. (T. 272-82.) However, when MinnComm began to install the water main pipeline under the main channel of the Mississippi River, it encountered difficulties. After the pilot hole had been drilled and pre-reamed, the product pipe became stuck, requiring the installation effort to be abandoned. (T. 121.)

37.     MinnComm was required to dig deep into the ground to retrieve its reamer. Nothing remarkable was found during the dig. (T. 334.) The mud returns also contained nothing unusual such as wood or concrete. (T. 329.)

38.     When the product pipe was extracted, it was twisted in an unusual spiral fashion. (T. 292-93; Exs. 1037-38.)

39.     Although the exact cause of MinnComm's difficulty in installing the water main under the main channel of the Mississippi River may never be known, the evidence establishes, and the Court finds, that MinnComm encountered an unforeseen obstruction.

40.     According to Dorwart, MinnComm's product pipe became stuck in an obstruction. One likely obstruction was a revetment wall that runs along Pettibone Park. (T. 465, 468-69, 481.) The Project plans and specifications do not identify this revetment. (T. 478.)

41.     According to Dorwart, MinnComm was working under the revetment area when the product pipe became stuck. (T. 481.) He believes that the pilot hole

may have been drilled immediately below the revetment, causing the difficulties in installing the product pipe.  (T. 524.)

42.     Dorwart testified that the revetment would be visible at the edge of Pettibone Park, but that the depth of the revetment would be unknown.  (T. 479, 505.)

43.     Dorwart noted that the location of the obstruction causing the product pipe to become stuck would not necessarily be located where MinnComm retrieved its reamer, explaining why nothing of significance was found where the reamer was located.  (T. 480-81.)

44.     Dorwart testified that the "critical data" regarding possible obstructions should have been included in the Project plans and specifications.  (T. 497.)  Daniel Weidner also testified that he would expect Yaggy Colby to alert MinnComm of the possibility of obstructions in the Project area.  (T. 366.)  The Court finds that such known information was required to be passed along to Project bidders.  The failure to do so was a material breach of the implied warranty of the plans and specifications.

45.     There is no evidence in the record indicating that MinnComm's equipment was not functional.  The Eclipse was inspected and no problems were discovered.  (T. 247, 384.)  In addition, there is no evidence that the drill head lost its mud circulation.

46.     The Court finds Dorwart's opinions to be factually sound and believable.  Dorwart's attribution of the problems in installing the water main to an obstruction is logical and intuitively plausible.  Although the City disputed

Dorwart's explanation, it offered no expert testimony providing an alternative explanation. (T. 782.)

47. MinnComm temporarily abandoned the main channel water main installation and focused on the main channel sanitary force main installation. (T. 293.)

48. When drilling the pilot hole for the sanitary force main, MinnComm drifted off the planned alignment by nearly 200 feet. Nevertheless, the pipeline was approved for that location and installed. (T. 309-14.)

49. The day after MinnComm installed the sanitary force main in the main channel, the pipe floated to the top of the Mississippi River. (Ex. 1047.)

50. The evidence establishes, and the Court finds, that MinnComm installed the sanitary force main at or slightly deeper than the 15-foot minimum cover as called for in the Project plans and specification, but that the 15-foot minimum cover was insufficient to prevent the pipe from floating.

51. There is no contemporaneously recorded data indicating the depths at which the pipe was installed by MinnComm. Troy Weidner testified that the pipe was installed at the proper depth. (T. 307-09.) The fact that the pipeline was installed at the proper depth in other locations of the Project supports the inference, and the Court finds, that the sanitary force main was installed at the proper depth in the main channel. (Ex. 1189.)

52. Dorwart used a mathematical model to compute pipe buoyancy based upon the soils data from boring B-20. Using that data, the model predicts that the pipe would float with 10 feet of cover, but would not float with 20 feet of cover. (T.

488.)  Accordingly, somewhere "between 10 to 20 feet is where you would expect the pipe to start floating."  (T. 489.)  Dorwart testified that the pipe in the main channel floated up because the 15-foot minimum cover was a "design deficiency."  (T. 497, 519.)  In contrast, Hair testified that a 15-foot minimum cover is consistent with industry standards.  (T. 764-65.)  However, Hair did not do his own analysis to determine whether the 15-foot minimum cover was sufficient for the Project in question, stating instead that he had "no basis for saying that the 15-foot minimum was unacceptable."  (T. 804.)  The Court credits the testimony of Dorwart.

53.  In addition to the insufficiency of the 15-foot minimum cover, the evidence establishes, and the Court finds, that the Project plans and specifications did not correctly identify the true bottom of the main channel of the Mississippi River, and therefore, information in the plans and specifications resulted in MinnComm installing the pipe at a depth less than 15 feet below the river bottom.  (T. 489.)  In fact, the force main was installed with only nine feet of cover in at least one location.  (T. 155-56, 489.)  Moreover, other information establishes that the river bottom is dynamic as a result of scour.  (T. 548-49.)

54.  Hair testified that most HDD projects involving a water crossing are installed with the assistance of a "down hole" survey system, and not the "walk-over" system utilized by MinnComm.  (T. 759.)  In his opinion, MinnComm's inability to complete the Project resulted from its failure to utilize more advanced equipment.  (T. 759.)  However, the evidence indicates, and the

Court finds, that HDD contractors commonly use walk-over locators, such as the Eclipse, for water crossings, and that such equipment is appropriate and effective. (Ex. 1190; T. 458.) The Court also finds that MinnComm's failure to use a "down hole" survey system was not a contributing factor in MinnComm's inability to complete the Project.

**MINNCOMM'S TERMINATION**

55. Due to the difficulties encountered, MinnComm requested additional time and extra costs to complete the Project, but the City denied these requests. (Exs. 1040, 1041, 1043, 1050, 1051, 1069.)

56. The Contract provided that if MinnComm found any substantial discrepancy between the Project plans and specifications and the actual conditions on the Project site, MinnComm should request instructions on how to proceed from the City. (Ex. 1020.) MinnComm sought instructions as to how to proceed given the difficulties experienced. (Ex. 1051.) Such instructions were not provided.

57. When requested, MinnComm declined to develop a plan for the completion of the Project, asserting that it was not the engineer for the Project. (Ex. 1051.)

58. On February 4, 2008, the City passed a Resolution declaring MinnComm in default and formally terminating the Contract. (T. 599-01.) This Resolution was required for the City to invoke Granite Re's obligations under the Performance Bond. (Ex. 1001.) MinnComm was terminated for its failure to meet the construction deadline. (T. 600.)

59. After termination of the Contract, MinnComm could no longer receive bonding for construction projects. (T. 400, 423.) The inability to receive bonding severely impacted MinnComm's ability to attain work, resulting in substantial financial harm. (T. 401.)

60. Harris William Waller, the public works director for the City, testified that the City had no knowledge pertaining to how contract termination would affect a contractor's bonding capacity. (T. 601.)

61. After the Contract was terminated, Yaggy Colby recommended that the water main and sanitary force main installed by MinnComm under the west channel and the lagoon be replaced because, at the time of a survey, the pipes were located less than 15 feet below the water bottom. (T. 604-05; Ex. 1159.)

62. The evidence indicates, and the Court finds, that the pipes in the lagoon and west channel were installed at the proper depth, but floated to the shallower locations. Troy Weidner testified that the pipes were installed at the proper depths. (T. 272-82.) The Court credits this testimony along with that of Dorwart, who testified that the pipes were installed at the correct depths, but floated to the shallower locations due to the same insufficiency of cover that caused the pipe to float to the top of the main channel of the Mississippi River. (T. 496.) Dorwart noted that the material in the west channel and the lagoon is softer and looser than what is found in the main channel, and therefore, the pipe would be expected to float from a greater depth. (T. 519.)

## DAMAGES

63. MinnComm submitted Pay Request No. 4 to the City, which was approved for a total amount of $171,268.79. (Ex. 1183, Tab 27.) The City made a partial payment of $21,801.32. (Id.) The amounts approved but unpaid ($149,467.47) represent the City's alleged liquidated damages and costs. (Id.)

64. MinnComm expended $631,821.89 in its attempt to install the water main under the main channel of the Mississippi River. (Ex. 1110.)

65. MinnComm expended $266,722.20 in its attempt to install the force main under the main channel of the Mississippi River. (Ex. 1111.)

66. When making payments to MinnComm, the City retained 5% of the approved payments. This retainage was to be paid at the completion of the Project. The amount of unpaid retainage for work completed by MinnComm is $36,968.67. (Ex. 1187; T. 408-09.)

67. MinnComm expended $60,768.00 on product pipe for the Project that the City has not paid for. (Ex. 1187; T. 409-10.)

68. MinnComm expended $12,600.00 to debead the main channel force main product pipe. MinnComm has not been paid for this work. (Ex. 1187; T. 410-11.)

69. MinnComm's lost profit damages testimony was provided by its President, Daniel Weidner, who is familiar with the company's financial records, accounting practices, and past financial performance. (T. 411-17.) MinnComm provided its actual gross revenues for the years 2005, 2006, 2007,

and 2008. (Ex. 1117.) Based on these financial figures, Weidner projected what MinnComm's gross revenues would have been had its business continued growing at the same rate. MinnComm then took the difference between the projected annual revenue for 2008 and subtracted actual 2008 revenue to arrive at its lost gross revenue claim for the year. It then used its gross profit percentage of 25% to arrive at a figure of $570,317.00 for 2008. For 2009, taking account of the economic slowdown, MinnComm assumed no growth from its projected 2008 earnings and also assumed the same actual revenue for 2009 as it actually experienced in 2008. Mr. Weidner therefore claims the same $570,317.00 of lost revenues for 2009. Accordingly, MinnComm's total lost revenue claim is $1,140,634.

## CONCLUSIONS OF LAW

## BREACH OF IMPLIED WARRANTY OF PLANS AND SPECIFICATIONS

70.  "[W]here one party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purposes implicit therein and whether the builder has been damaged in proceeding with the work in reliance on such an implied warranty or whether he was damaged in relying on the warranty in making his bid, he may recover." McCree & Co. v. State, 91 N.W.2d 713, 724 (Minn. 1958). By providing the plans and specifications to MinnComm, the City warranted that the plans and specifications were adequate, fit, and suitable for their intended purpose.

71.     The City contends that it did not assert control over MinnComm's "means and methods," and therefore, an implied warranty of the plans and specifications does not exist. (City Post-Trial Brief at 14-15.) However, Minnesota law does not expressly require control over contractor "means and methods" for an implied warranty to be established. Nevertheless, the Contract in this case provided that "all [Project] work shall be done in accordance with the plans and specifications." (Ex. 1020.) Moreover, Dombrovski testified that he expected MinnComm to follow the pipe profile he designed. Accordingly, the Court determines that the City asserted control over MinnComm's "means and methods."

72.     No direct evidence is "necessary to establish the reliance of the ultimately successful bidder on the contract." Alley Constr. Co. v. State, 219 N.W.2d 922, 925 (Minn. 1974) (internal quotation marks and citation omitted). Therefore, "reliance may be inferred from the facts and circumstances surrounding the award of the contract." Eric A. Carlstrom Constr. Co. v. Indep. Sch. Dist. No. 77, 256 N.W.2d 479, 484 (Minn. 1977). The Court finds that MinnComm relied upon the plans and specifications in bidding and constructing the Project.

73.     Yaggy Colby did not provide MinnComm with a constructible design because (1) critical data regarding known obstructions was withheld and (2) the plans and specifications provided for an insufficient minimum cover over the pipeline.

74. The plans and specifications did not notify bidders of possible obstructions. MinnComm was therefore justified in assuming no such obstructions were present in the Project site.

75. MinnComm encountered an obstruction which prevented it from installing the water main in the main channel of the Mississippi River. By not providing information about possible obstructions in the Project area, the City breached the implied warranty of the plans the specifications. See Ryan Contracting, Inc. v. City of Shakopee, No. C2-97-1286, 1998 WL 101350, at *5 (Minn. Ct. App. Mar. 10, 1998) (holding that if the contractor is required to perform extra work due to conditions encountered on the construction site differing substantially from those depicted in the plans and specifications, the owner breaches the implied warranty of the plans and specifications); Fosston Plumbing v. City of Argyle, No. CX-89-2284, 1990 WL 152706, at *1-2 (Minn. Ct. App. Oct. 16, 1990) (holding that when the plans and specifications "indicated dry and stable conditions," the existence of wet soils breached the implied warranty).

76. The revetment was not an open and obvious condition because the depth of the revetment was unknown. The implied warranty of plans and specifications is not overcome by clauses "requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work." McCree, 91 N.W.2d at 722 (internal quotation marks and citation omitted); accord Zontelli & Sons, Inc. v. City of Nashwauk, 373 N.W.2d 744, 754 (Minn. 1985). The

pipe profile went directly under the revetment and MinnComm had the right to rely on and follow that profile.

77. In addition to the non-disclosure of the obstruction information, the design of the Project was undertaken without adequately determining the depth of the water bodies, the effect of local scour, the sufficiency of the soils, and the proper minimum cover for the pipeline.

78. MinnComm has established by a clear preponderance of the evidence that it utilized experienced employees and conventional, industry-accepted equipment.

79. MinnComm has established by a clear preponderance of the evidence that it complied with the 15-foot minimum cover provided for in the plans and specifications, for all three water crossings.

80. The failure of the sanitary force main pipe to remain below the river surface was caused by the inadequate determination of the river depth and the insufficiency of the minimum cover as set forth in the plans and specifications. The failure of the pipelines in the west channel and lagoon to remain at their proper depths was also caused by the insufficiency of the specified minimum cover. Accordingly, the implied warranty of the plans and specifications was breached. See McCree, 91 N.W.2d at 716 (finding a breach of the implied warranty of plans and specifications when it was impossible to complete the construction project as described in the plans and specifications).

81.     As a direct and proximate cause of the City's breaches of the implied warranty

of the plans and specifications, MinnComm was damaged and is entitled to

recover from the City those amounts necessary to be put in the position it

would have been had the breach not occurred.

**BREACH OF CONTRACT**

82.     A breach of contract occurs when a party renounces its liability under the

contract, hinders performance by the other party to the contract, or totally or

partially fails to perform its contractual obligations.  See Associated Cinemas

of Am., Inc. v. World Amusement Co., 276 N.W. 7, 10 (Minn. 1937).

**MinnComm's Claims**

      **A.     Failure to compensate for materials and labor furnished by MinnComm**

83.     MinnComm submitted Pay Request No. 4 to the City, which was approved for

a total amount of $171,268.79.  (Ex. 1183, Tab 27.)  The City made a partial

payment of $21,801.24.

84.     Under the terms of the Contract, MinnComm is entitled to be paid for work

completed on the Project approved by the Common Council.  Accordingly, the

failure to make the full payment of the amounts described in Pay Request No.

4 is a breach of contract.

### B.    Termination

85. "[A]n owner who unreasonably fails to allow the contractor to complete the project excuses the contractor's performance and breaches the contract." Zobel & Dahl Constr. v. Crotty, 356 N.W.2d 42, 45 (Minn. 1984).

86. The City's failure to allow MinnComm's completion of the Project is a breach of contract.

### C.    Other breach claims

87. MinnComm asserts that the City has breached the Contract in other ways described in the pleadings. (MinnComm Answer & Crosscl. ¶ 24.) However, because these claims would provide for the recovery of damages duplicative of those recoverable for breach of the implied warranty of the plans and specifications, the Court need not address these additional claims.

### The City's Claims

88. The City alleges that "MinnComm breached the contract by failing to complete the project work in accordance with the contract plans and specifications on or before November 30, 2007; by failing to install the pipes in a location in accordance with the project specifications and by failing to guarantee that its workmanship is free from defects for a period of one year after acceptance and completion." (City Post-Trial Mem. at 17.)

89. MinnComm was unable to complete the Project in a timely manner and in accordance with the plans and specifications as a result of the City's breach of the implied warranty of the plans and specifications.

90. Accordingly, the City's breach of contract claims will be dismissed.

## DECLARATORY JUDGMENT AND CLAIM FOR PAYMENT UNDER THE PERFORMANCE BOND

91. Granite Re is not liable to the City under the terms of the Performance Bond because the City materially breached the Contract.

## NEGLIGENCE

92. The City asserts that MinnComm was negligent in its performance of its contractual duties. (City Crosscl. ¶¶ 34-37.)

93. The City put forth no evidence at trial to substantiate its negligence claim. In addition, the City made no mention of its negligence claim in its post-trial submissions.

94. Accordingly, the City's negligence claim will be dismissed.

## QUANTUM MERUIT

95. MinnComm waived its claim of Quantum Meruit. (Post-Trial Reply Mem. at 2 n.2.) Accordingly, MinnComm's quantum meruit claim will be dismissed.

## DEFAMATION

96. MinnComm asserts a claim of defamation against the City, claiming that because it did not breach the Contract, the City's Resolution declaring it in default was defamatory.

97. "The elements of a common law defamation action are well settled. In order for a statement to be considered defamatory it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the

plaintiff's reputation and to lower him in the estimation of the community."
Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980).

98.    However, "[e]ven if an untrue defamatory statement is published, there will be no liability if the statement is . . . privileged and the privilege is not abused." Keuchle v. Life's Companion P.C.A., Inc., 653 N.W.2d 214, 220 (Minn. Ct. App. 2002). Whether a qualified privilege exists is a question of law. Brooks v. Doherty, Rumble & Butler, 481 N.W.2d 120, 124 (Minn. Ct. App. 1992).

99.    To establish entitlement to a qualified privilege, a statement must be made in good faith, on a proper occasion, from a proper motive, and based on reasonable cause. Stuempges, 297 N.W.2d at 256-57.

100.   The Resolution declaring MinnComm in default was required to terminate the Contract and invoke Granite Re's obligations under the Performance Bond. Therefore the Resolution was passed on a proper occasion.

101.   The desire to terminate a contractor who is believed to be insufficiently performing its responsibilities is a proper motive. See Hebner v. Great N. Ry. Co., 80 N.W. 1128, 1129 (Minn. 1899).

102.   The Resolution was passed upon reasonable cause. "Reasonable grounds can exist if a person has valid reasons for believing a statement, even though the statement later proves to be false." Elstrom v. Indep. Sch. Dist. No. 270, 533 N.W.2d 51, 55 (Minn. Ct. App. 1995). As evidenced during trial, the City had reason to believe that termination was appropriate under the circumstances presented.

103.    There is no evidence that the Resolution was passed in bad faith.

104.    Accordingly, the City is protected from liability by a qualified privilege.

105.    In order to defeat a qualified privilege, a plaintiff must show "actual malice." Stuempges, 297 N.W.2d at 257. To demonstrate "actual malice," a plaintiff must demonstrate that the defendant "made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." McKenzie v. Wm. J. Burns Int'l Detective Agency, Inc., 183 N.W. 516, 517 (1921).

106.    MinnComm has not put forth any evidence indicating the City's "actual malice." Accordingly, the qualified privilege cannot be overcome and MinnComm's defamation claim will be dismissed.

## PROMPT PAYMENT STATUTE

107.    MinnComm alleges the violation of Minn. Stat. § 471.425, Minnesota's Prompt Payment Statute. MinnComm asserts that approved payment requests were not paid within 35 days of approval. (MinnComm Crosscl. ¶¶ 32-37.) Accordingly, MinnComm seeks payment, interest, costs, disbursements, and attorneys' fees. (Id. ¶ 37.)

108.    Minnesota's Prompt Payment Statute provides a remedy for contractors in cases where municipalities fail to make prompt payment of contract monies to a contractor without a good-faith basis for doing so. Minn. Stat. § 471.425. Pursuant to the Prompt Payment Statute, a municipality is required to pay the contractor "according to the terms of the contract or, if no contract terms apply,

within the standard payment period unless the municipality in good faith disputes the obligation." Id.

109. The City did not issue full payment to MinnComm for Pay Request No. 4. Nevertheless, the Prompt Payment Statute has not been violated because the City, in good faith, disputed the obligation. The evidence put forth at trial supports the City's good faith belief that MinnComm was not entitled to payment.

110. Accordingly, MinnComm's claim under Minn. Stat. § 471.425 will be dismissed.

## DAMAGES

111. As a direct and proximate result of the City's breach of contract and breach of the implied warranty of the plans and specifications, MinnComm was damaged by and is entitled to recover from the City the amounts necessary to put it in the position it would have been had the breach not occurred.

112. MinnComm's claimed damages are summarized in Exhibit 1187; supporting documentation is provided in Exhibits 1110, 1111, 1112, 1113, 1114, and 1117. A summary of MinnComm's claim is as follows:

| | | |
|---|---|---|
| 1) | UNPAID PAY APPLICATIONS | $149,467.47[2] |
| 2) | UNPAID RETAINAGE | $36,968.67 |
| 3) | BORE #1 EXPENSES INCURRED | $631,821.89 |

---

[2] Exhibit 1187 gives a total of $140,467.47 Unpaid Pay Applications. However, this appears to be a typographical error because the difference between the amounts approved in Pay Application No. 4 and the amounts paid on this application is $149,467.47.

| | | |
|---|---|---|
| 4) | BORE #2 EXPENSES INCURRED | $266,722.20 |
| 5) | 12" HDPE PIPE BORE 1 & 2 | $60,768.00 |
| 6) | DEBEADING BORE #2 1800' (FM) | $12,600.00 |
| 7) | EXPERT COST | T.B.D. |
| 8) | LEGAL FEES | T.B.D. |
| 9) | INTEREST | T.B.D. |
| 10) | PRE-JUDGMENT INTEREST | T.B.D. |
| 11) | LOST REVENUE FOR THE YEARS 2008, 2009 | |
| | 2008 | $570,317.00 |
| | 2009 | $570,317.00 |
| | TOTAL CLAIM: | $ 2,298,982.23 |

113. The City did not raise any issues at trial or in its post-trial submissions regarding the first six items of MinnComm's claimed damages. The Court finds that such damages are the direct and proximate cause of the City's breach of the implied warranty of the plans and specifications and the City's breach of contract. Accordingly, such amounts will be awarded.

114. MinnComm requests attorneys' fees, costs, disbursements, and interest under Minnesota's Prompt Payment Statute. Because this claim will be dismissed, such damages are not recoverable.

**A.      Lost Profits**

115. The City disputes MinnComm's claim for lost profits for the years 2008 and 2009, which MinnComm asserts resulted from the loss of its bonding capacity.

116. "[D]amages recoverable in contract actions are those arising naturally from the breach or those which can reasonably be supposed to have been contemplated by the parties when making the contract as the probable result of that breach." Lassen v. First Bank Eden Prairie, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994). Damages may be "so likely to result from breach that they can reasonably be said to have been foreseen." Id. (citing Franklin Mfg. Co. v. Union Pac. R.R. Co., 248 N.W.2d 324, 325 (Minn. 1976)). Whether damages were reasonably foreseeable at the time of contracting is a question of fact. Franklin Mfg., 248 N.W.2d at 325.

117. The Court finds that it was reasonably foreseeable, at the time the Contract was executed, that termination would result in MinnComm losing its bonding capacity. It was also reasonably foreseeable that lost bonding capacity would cause significant financial harm in the form of lost business and resulting revenues and profits. While the City itself may not have actually foreseen such damages, what the City actually foresaw is not relevant. As a municipality that itself requires performance bonds on construction contracts, the loss of bonding capacity and the resulting harm was a *reasonably* foreseeable consequence of wrongful termination. See 6 Philip L. Bruner & Patrick J. O'Connor, Bruner and O'Connor on Construction Law § 19:90 (2002); Laas v. Mont. State Highway Comm'n, 483 P.2d 699, 704 (Mont. 1971) (finding the loss of bonding capacity to be reasonably foreseeable).

118.   Lost profits, to be recoverable, must be "shown to be the natural and probable consequence[] of the act or omission complained of." <u>Cardinal Consulting Co. v. Circo Resorts, Inc.</u>, 297 N.W.2d 260, 266 (Minn. 1980). MinnComm has established that it has suffered lost profits as a direct result of its lost bonding capacity. Moreover, MinnComm has established that its bonding capacity was lost as a direct result of the City's wrongful termination of the Contract.

119.   Lost profits must be proven "with a reasonable degree of certainty and exactness." <u>County of Blue Earth v. Wingen</u>, 684 N.W.2d 919, 924 (Minn. Ct. App. 2004) (internal quotation marks and citation omitted). "This means that the nature of the business . . . upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts." <u>Cardinal Consulting</u>, 297 N.W.2d at 266.

120.   "Damages do not have to be proved with mathematical certainty." <u>Imdieke v. Blenda-Life, Inc.</u>, 363 N.W.2d 121, 125 (Minn. Ct. App. 1985). "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." <u>Blaine Econ. Dev. Auth. v. Royal Elec. Co.</u>, 520 N.W.2d 473, 479 (Minn. Ct. App. 1994) (internal quotation marks and citation omitted). In fact, "[a]n experienced contractor's best estimate, reasonably compiled, is acceptable evidence." <u>Id.</u>

121.   Daniel Weidner, as the President of MinnComm, had sufficient knowledge of MinnComm's business and financial information to testify as to MinnComm's

lost profits. Expert testimony is not required to recover lost profits. <u>See</u>

<u>Marvin Lumber & Cedar Co. v. PPG Indus., Inc.</u>, 401 F.3d 901, 915 (8th Cir.

2005) (applying Minnesota law) (noting that the testimony of a company's

executives is sufficient to establish right to recover lost profits); <u>Cardinal</u>

<u>Consulting</u>, 297 N.W.2d at 269 ("[E]xpert testimony is not always required to

prove lost profits.").

122.  The record clearly establishes that MinnComm suffered lost profits in 2008.

MinnComm established its previous profitability, rate of growth, and the

paucity of its profits in 2008. <u>See</u> <u>Spinett, Inc. v. Peoples Natural Gas Co.</u>, 385

N.W.2d 834, 839 (Minn. Ct. App. 1986) (proof of lost profits "may include a

company's past performance and its future success"). The Court finds that but

for the City's breach, MinnComm would have earned profits in 2008 in an

amount at least as high as its profits in 2007. MinnComm had revenues of

$3,542,544 in revenue in 2007 and $1,898,932 in 2008. (Ex. 1117.)

Accordingly, MinnComm produced $1,643,612 less in revenue in 2008 as a

result of the breach. With 25% of revenue consisting of profit, MinnComm is

entitled to an award of lost profits for 2008 in the amount of $410,903. The

Court finds this to be a fair and conservative estimation of lost profits in 2008

given MinnComm's history of yearly growth in profits.

123.  However, the Court finds that any lost profits in 2009 are too remote and

speculative to be awarded given the passage of time, the volatile nature of the

current economic environment, and the lack of information regarding MinnComm's actual revenues earned thus far in 2009.

**B.** **Prejudgment interest**

124. The City does not challenge MinnComm's request for prejudgment interest under Minn. Stat § 549.09.

125. For the "Unpaid Pay Applications," as described in Exhibit 1187, MinnComm asserts, and the City does not dispute, that the accrual date for prejudgment interest is December 31, 2007. Accordingly, the Court finds that prejudgment interest for "Unpaid Pay Applications" began to accrue as of that date.

126. For "Bore #1 Expenses Incurred" as described in Exhibit 1187, MinnComm asserts, and the City does not dispute, that the accrual date for prejudgment interest is November 13, 2007. Accordingly, the Court finds that prejudgment interest for "Bore #1 Expenses Incurred" began to accrue as of that date.

127. For 2008 lost profits, MinnComm asserts, and the City does not dispute, that the accrual date for prejudgment interest is January 1, 2009. Accordingly, the Court finds that prejudgment interest for such lost profits began to accrue as of that date.

128. For "Unpaid Retainage," "Bore #2 Expenses Incurred," "12'' HDPE Pipe Bore 1 & 2," and "Debeading Bore #2 1800'," as described in Exhibit 1187, the parties dispute the proper accrual date for prejudgment interest. MinnComm asserts that the proper date is February 20, 2008, the date Granite Re commenced its declaratory judgment action. The City asserts that the proper

accrual date is April 1, 2008, the date that MinnComm asserted its Crossclaims against the City. Minn. Stat § 549.09 provides that prejudgment interest will begin to accrue at the time of written notice of claim or at "the time of the commencement of the action." Because MinnComm did not commence its claims against the City until April 1, 2008, the Court finds that prejudgment interest will accrue as of that date.

## CONCLUSION

In summary, the Court finds as follows:

1) On the breach of implied warranty of plans and specifications claim against the City, in favor of MinnComm;

2) On the breach of contract claims against the City, in favor of MinnComm;

3) On the defamation claim against the City, in favor of the City;

4) On the quantum meruit claim against the City, in favor of the City;

5) On the Prompt Payment Act claim against the City, in favor of the City;

6) On the breach of contract claims against MinnComm, in favor of MinnComm;

7) On the negligence claim against MinnComm, in favor of MinnComm;

8) On Granite Re's declaratory judgment action, in favor of Granite Re;

9) On the City's surety claim against Granite Re, in favor of Granite Re; and

10) MinnComm is entitled to damages in the total amount of $1,569,251.23, plus prejudgment interest to be calculated from the accrual dates as described above.

On or before September 21, 2009, MinnComm shall serve and file a proposed form of Judgment consistent with this Order.  Objections thereto may be filed within seven (7) days of the receipt thereof.


Dated: September 11, 2009                    s/Richard H. Kyle
                                             RICHARD H. KYLE
                                             United States District Judge